## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

ANTHONY HEUSER AND NONA HEUSER,

        Plaintiffs,

    vs.                                    NO. CIV 95-257 MV/LCS

GARY JOHNSON, et al.

        Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER COMES** before the Court on Plaintiffs' Motion for Partial Summary Judgment, filed July 13, 1998 **[Doc. No. 358]**; the San Juan County Defendants' Notice of Objection to Magistrate's Order and Motion for Order to Show Cause, filed May 24, 2001 **[Doc. No. 516]**; the San Juan County Defendants' Motion to Disqualify the Honorable Martha Vázquez, filed May 24, 2001 **[Doc. No. 514]**; and Plaintiffs' Motion to Admonish Defendants for Filing Their Supplementation of and Opposition to Deposition Testimony & Affidavits Pursuant to Rule 56(e) and Notice of Misrepresentation of Fact Contained in Plaintiffs' Supplemental Memorandum in Support of Motion for Summary Judgment Without Seeking Leave of Court, filed June 5, 2001 **[Doc. No. 525]**.

The Court, having considered the parties' submissions and relevant law, and being otherwise fully informed, finds that Plaintiffs' Motion for Partial Summary Judgment is well-taken and will be **GRANTED**; Defendants' Motion to Disqualify is not well-taken and will be **DENIED**; the Magistrate Judge's Order Denying the Motion to Enforce Subpoena will be

**AFFIRMED**; Defendants' Motion for Order to Show Cause is not well-taken and will be

**DENIED**; and Plaintiffs' Motion to Admonish is not well-taken and will be **DENIED**.

## BACKGROUND[1]

Plaintiffs Anthony and Nona Heuser are an elderly couple who live in San Juan County,

New Mexico, outside the Farmington city limits.  They receive electrical service from the city-

owned-and-operated utility system (the "FUS").  Pursuant to state statute, the City has authority

to own and operate a utility system within a 5-mile radius of Farmington.[2]  On July 2, 1991,

Defendant Kephart, a building official for the County of San Juan, was driving by Plaintiffs'

property and noticed what he believed to be a building on the property for which no permit had

been obtained.  On that same date, Kephart left a stop-work notice at Plaintiffs' home.

Kephart then filed a criminal complaint against Anthony Heuser for failure to obtain a

building permit, in violation of San Juan County Ordinance Number 9.[3]  The case went before

Magistrate Brenda Hines.  Heuser had Magistrate Hines disqualified and Heuser was found guilty

---

[1]This discussion of the factual and procedural background of the matters presently pending before the Court is derived from the Court's numerous prior Orders and Memorandum Opinions, as well as from material considered in conjunction with Plaintiffs' Motion for Partial Summary Judgment.

[2]"Any municipality may, by ordinance, acquire, operate and maintain an electric utility for the generation and distribution of electricity to persons residing within its service area. The service area of a municipality includes: . . . (2) territory within five miles of the boundary of the municipality in the case of any municipality heretofore acquiring or operating any municipal electric utility or part thereof in the territory within five miles of the boundary of the municipality."  NMSA 1978, § 3-24-1.

[3]"No person shall construct, alter, repair, or demolish any building without first obtaining a separate building permit for each building or structure, except that no permit shall be required for performing minor repairs if allowed by the fee schedule fixed below."  SJC-9-2.1.  *See* Doc. No. 360, Att. 1, Ex. 5.

of violating Ordinance No. 9 on February 3, 1992.  Heuser appealed, requesting a *de novo* trial in state district court.  In August 1992, the conviction was overturned and Heuser was found not guilty of violating the county ordinance.

On February 11, 1992, while the criminal appeal was pending, Kephart called Mr. Heuser and sought permission to enter and inspect the Heusers' property.  Heuser denied Kephart permission to enter and search the property.  On March 11, 1992, Kephart approached County Deputy Sheriff Cheverie and asked him for assistance in obtaining a search warrant to be executed on Plaintiffs' property.

Deputy Sheriff Cheverie then executed an affidavit and application for a search warrant. The affidavit stated that Kephart had noticed county building code violations on the property and that a search was necessary to determine precisely which sections of the county building code were being violated.  The affidavit did not state that there was a need to search for violations of the electrical code.  Magistrate Brenda Hines, who had been disqualified from hearing Mr. Heuser's criminal case, signed a warrant authorizing a search of Plaintiffs' property, but specifically excluding the Plaintiffs' residence from the permissible scope of the search.

On the same day, the warrant was executed.  Present at the execution were Kephart and Cheverie, four additional county police officers, Defendant Hrzich (a city electrical inspector), Defendant McQuitty (a city code compliance officer), a plumbing code enforcement official, and an animal control officer.  During the search, defendants Hzrich and McQuitty entered a residential garage which was attached to the residence and found what they believed to be violations of the electrical code.  The Heusers were informed by FUS that if they failed to remedy these violations, their electricity would be cut off.  The Heusers were not given any information

3

regarding the procedure for challenging the determination that the garage contained electrical code violations.

In May 1992, Plaintiffs filed a state court action against Hrzich individually over the incident.  In connection with this suit, Plaintiffs were told that Hrzich had authority to inspect Plaintiffs' property for electrical violations pursuant to a joint powers agreement.  On June 10, 1992, FUS cut off the electricity to Plaintiffs' entire residence and to the grain shed.  On January 13, 1993, Mr. Heuser appeared before the Farmington City Council (which acts as board of directors of FUS) and requested reconnection of electrical power on the basis that Kephart had no authority to obtain the warrant.  At this meeting, the mayor of Farmington told Heuser that he would get a copy of the joint powers agreement.  No joint powers agreement has ever been produced and Defendants now apparently concede that none exists.

Plaintiffs' electrical power was reconnected on April 2, 1993 after Plaintiffs sought assistance from the state bar association's Lawyer Referral for the Elderly Program.  However, the power was disconnected again by McQuitty and two unidentified linemen on May 26, 1993.  On May 27, 1993, another county deputy sheriff and three unidentified linemen came to the Heusers' home and requested permission to remove the electricity meter.  Mrs. Heuser gave them permission to remove the meter, but did not give them permission to climb on top of the house.  The linemen then climbed on the roof, without permission, and removed wires that were running from the house to the electrical pole.  These wires had been purchased by the Heusers.  The Heusers then purchased a generator, on which they depended to provide them with electricity for the next several years.

On March 10, 1995, Plaintiffs filed a *pro se* civil rights complaint in this Court, alleging

4

that Defendants' actions violated their constitutional rights.  On April 14, 1995, Plaintiffs filed an amended complaint, again *pro se*.  On July 22, 1997, the Court entered an order dismissing several of Plaintiffs' claims.  Several of the defendants filed motions for summary judgment, which were denied.  These defendants then filed interlocutory appeals of the Court's denial of their summary judgment motions.

On December 17, 1997, Richard Rosenstock entered his appearance on behalf of Plaintiffs and on January 29, 1998, Plaintiffs sought reconsideration of the Court's July 22, 1997 Order.  On March 24, 1998, the Court entered an Order certifying the Defendants' interlocutory appeals as frivolous.  In doing so, the Court made several findings of fact and concluded that the existence, at that time, of disputed issues of material fact precluded appellate review.  On April 22, 1998, the Court granted, in part, Plaintiffs' motion for reconsideration and reinstated several of the claims that the Court had earlier dismissed.  On April 29, 1998, Plaintiffs sought permission to file a Third Amended Complaint.  On July 13, 1998, Plaintiffs filed a Motion for Partial Summary Judgment.

On April 30, 2001, the Court entered an order granting Plaintiffs' Motion to File a Third Amended Complaint.  In their Third Amended Complaint, Plaintiffs allege that all of the Defendants "engaged in a campaign of harassment designed to retaliate against them for having engaged in conduct protected by the First Amendment" in that:

(1) Defendants Cheverie and Kephart unlawfully procured a search warrant to search their residence and property;

(2) Defendants Kephart, Hrzich, and McQuitty conducted the search in an unlawful manner;

5

(3) Defendants FUS, Hrzich, and McQuitty unlawfully disconnected the electricity to Plaintiffs' residence even though the search warrant did not provide for a search for violations of the Farmington City electrical code and expressly excluded any search of the residence;

(4) Defendants illegally terminated Plaintiffs' electrical service on June 10, 1992 without providing them notice of the procedures available for contesting the termination;

(5) Defendant McQuitty unlawfully terminated Plaintiffs' electrical service on May 26, 1993;

(6) Defendants failed to provide Plaintiffs with an opportunity to contest the cut-off decision before a designated employee of FUS; and

(7) employees of Defendant FUS unlawfully entered onto Plaintiffs' home on May 27, 1993 and cut wires that ran from the house to the lift pole in the yard.

*See* Third Am. Compl. at 1.  Plaintiffs allege that these actions violated their rights under the Fourth and Fourteenth Amendments, that the Defendants conspired together to violate their rights, and the motivation behind the conspiracy was Plaintiffs' protected First Amendment rights. Plaintiffs also seek attorneys' fees pursuant to 42 U.S.C. § 1988.  On April 30, 2001, the Court granted the County Defendants' Motion to file supplemental briefing in opposition to Plaintiffs' Motion for Summary Judgment.  The summary judgment motion has now been amply briefed and is ripe for consideration.

In addition, the San Juan County Defendants have sought to compel the deposition of Winfred Paul Adams, an acquaintance of the Heusers'.  In an order entered May 11, 2001, United States Magistrate Judge Smith denied Defendants' Motion to Enforce Subpoena and Defendants have appealed Magistrate Judge Smith's decision.  Plaintiffs filed a timely response to Defendants'

Objection and Defendants timely replied.  Finally, the San Juan County Defendants have filed a

Motion to Disqualify, alleging that Mr. Adams has made threats against the Court and for that

reason the Court cannot possibly decide the matters pending before her in an unbiased fashion.

Plaintiffs filed a timely response to that motion.

## APPLICABLE STANDARDS

### A.  Summary Judgment

Summary judgment is an integral part of the Federal Rules of Civil Procedure, which are

intended to "'secure the just, speedy and inexpensive determination of every action.'"  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).  Under Rule 56(c) of the

Federal Rules of Civil Procedure, summary judgment is appropriate when the Court, viewing the

record in the light most favorable to the non-moving party, determines that "there is no genuine

dispute over a material fact and the moving party is entitled to judgment as a matter of law."

*Thrasher v. B&B Chemical Co.*, 2 F.3d 995, 996 (10th Cir. 1993).

The moving party bears the initial burden of showing that "there is an absence of evidence

to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887,

891 (10th Cir. 1991).  Once the moving party meets this burden, Rule 56(e) "requires the

nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions,

answers to interrogatories, and admissions on file,' designate specific facts showing that there is a

genuine issue for trial." *Celotex*, 477 U.S. at 324.  "Where the record taken as a whole could not

lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the material submitted by the parties in support of and in opposition to the

motion must be construed liberally in favor of the party opposing the motion, *see Harsha v. United States*, 590 F.2d 884, 887 (10th Cir. 1979), the burden on the moving party may be discharged by demonstrating to the district court that there is an absence of evidence to support the nonmoving party's position.  *Celotex*, 477 U.S. at 325.  In such a situation, the moving party is entitled to judgment as a matter of law.

### B. Notice of Objection to Magistrate's Order and Motion for Order to Show Cause

There is a dispute as to the standard of review that this Court should employ in reviewing Magistrate Judge Smith's denial of Defendants' Motion to Enforce Subpoena.  Plaintiffs contend that the "clearly erroneous or contrary to law" provision of Fed. R. Civ. P. 72(a) applies, whereas Defendants contend that Magistrate Judge Smith's Order is subject to *de novo* review.  Defendants base this argument on their contention that Magistrate Judge Smith's Order "was based on his construction and interpretation of newly revised Fed. R. Civ. P. 26(b) and therefore involved a question of law."  *See* Doc. No. 529 at 1.

Federal Magistrate Judges may make rulings on nondispositive motions.  *See* Fed. R. Civ. P. 72(a).  A party seeking to have a Magistrate Judge's decision on a nondispositive manner overturned "must show that the magistrate's order is 'clearly erroneous or contrary to law.'" *Epling v. UCB Films, Inc.*, 2001 WL 584355, *1 (D. Kan.  Apr. 2, 2001) (quoting *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997)).  Under this standard, the District Court must affirm the Magistrate Judge's decision "unless 'on the entire evidence [the court] is left with the definite conviction that a mistake has been committed.'"  *Id.* (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948); and citing *Ocelot Oil Corp. v. Sparrow Industries*, 847

F.2d 1458, 1462 (10th Cir. 1988)).

Magistrate Judges are also empowered to hear dispositive matters; however, they may not issue dispositive rulings on these matters. *See* Fed. R. Civ. P. 72(b). Rather, a Magistrate Judge considering a dispositive matter makes a recommendation for disposition. *See id.* A party who disagrees with a Magistrate Judge's recommendation may file objections with the District Court and the Court will review the Magistrate Judge's recommendation *de novo*. *See Ocelot Oil Corp. v. Sparrow Industries*, 847 F.2d 1458, 1462 (10th Cir. 1988) ("While magistrates may hear dispositive motions, they may only make proposed findings of fact and recommendations, and district courts must make de novo determinations as to those matters if a party objects to the magistrate's recommendations.")

Defendants have offered, and the Court has found, no authority to support the contention that a Magistrate Judge's decision on a nondispositive matter is subject to *de novo* review simply because the Magistrate Judge based his decision on a newly amended provision of the Federal Rules of Civil Procedure. *Ocelot Oil Corp.*, which Defendants cite in their Reply, does not stand for this proposition. In *Ocelot Oil Corp.*, a federal Magistrate Judge granted a motion to strike certain pleadings as a discovery sanction. The Magistrate Judge's decision had the effect of terminating the action as to certain defendants. *See id.* The Tenth Circuit ruled that such an order was beyond the authority of the Magistrate Judge. *See id.* Magistrate Judge Smith's Order denying the Motion to Enforce Subpoena was not dispositive; its only effect was to permit Mr. Adams to avoid having to be deposed. Such an Order is clearly nondispositive and is, therefore, subject to the deferential standard of review set forth in Fed. R. Civ. P. 72(a).

## C. Motion to Disqualify

Federal judges have a statutory obligation to recuse themselves "in any proceeding" in which their impartiality might reasonably be questioned. *See* 28 U.S.C. § 455(a). In determining whether § 455(a) requires recusal, the Court must determine "whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993) (internal quotations omitted).

"The standard is purely objective. The inquiry is limited to outward manifestations and reasonable inferences drawn therefrom. In applying the test, the initial inquiry is whether a reasonable *factual* basis exists for calling the judge's impartiality into question." *Id.* at 933. The requirements of § 455(a) will not ordinarily be satisfied by "rumor, speculation, opinion and similar non-factual matters" or by the presence of "baseless personal attacks on or suits against the judge by a party or by threats or other attempts to intimidate the judge." *Id.* at 933-34; *accord United States v. Greenspan*, 26 F.3d 1001, 1005 (10th Cir. 1994). Section 455(a) "is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice." *Id.* at 933.

The Tenth Circuit has emphasized that "[t]here are few characteristics more indispensable to justice than the characteristic of impartiality. Congress has mandated that justice must not only be impartial, but also that it must be perceived as impartial. . . . [T]he purpose of section 455(a) is to promote public confidence in the judicial process." *Greenspan*, 26 F.3d at 1007. However, a judge "has as much obligation not to recuse himself where there is no reason to do so as he does to recuse himself when the converse is true." *Id.* at 1006. Therefore, while § 455 may require recusal when a judge has been actually threatened by a party, as in *Greenspan*, "[t]he mere fact

that a defendant has made derogatory remarks about a judge is insufficient to convince a sane and reasonable mind that the attacked judge is biased or prejudiced." *United States v. Bray*, 564 F.2d 851, 858 (10th Cir. 1976).

## DISCUSSION

### A. Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs seek summary judgment on their claims that: (1) the March 11, 1992 search warrant was obtained by judicial deception; (2) the Defendants exceeded the scope of the warrant by conducting a search for alleged electric code violations (including a search of the residential garage which was excluded from the warrant); and (3) the manner in which Plaintiffs' electrical service was terminated violated their right to procedural due process.  Plaintiffs also seek summary judgment on their claim that Kephart and/or Cheverie violated their Fourth Amendment rights by bringing a City of Farmington inspector who had no authority to inspect their property because it was not within his jurisdiction and on their claim that an electrical code enacted in 1990 cannot be legally applied to a residential garage that was built in the 1970s.

### Undisputed Facts

As explained above, in its March 24, 1998 Order, the Court listed several of the facts that it determined were not in dispute at that time.  The Defendants sought the opportunity to submit supplemental briefing on the summary judgment motion partly on the basis that additional discovery brought to light several disputed issues with regard to these facts.

Having reviewed its prior orders, Plaintiffs' Motion for Partial Summary Judgment and Defendants' Opposition thereto, and both parties' supplemental briefs, the Court finds that there is no genuine dispute as to the following facts, which are material to the claims on which Plaintiffs

seek summary judgment.

1.  Plaintiffs have lived at their house since the 1970s, when the house was built.
Sometime before 1992, Plaintiffs built a grain shed on their property.  *See* Doc. No. 359, Ex. 1;
Doc. No. 503, ¶ 2, *et seq.*

2.  In July 1991, Kephart sought permission to enter and inspect Plaintiffs' property.
Permission was denied.  *See* Doc. No. 359, Att. 1 at ¶ 8.

3.  Kephart filed criminal charges alleging that the construction of the grain shed violated
County Ordinance 9 of the county building code.  *See* Doc. No. 359, Att. 1 at ¶ 9 & Ex. 4.
Magistrate Hines was disqualified from hearing the case.  Mr. Heuser was convicted of violating
Ordinance 9, but his conviction was subsequently overturned.  *See* Doc. No. 360, Ex. 7; Doc. No.
521, Ex. 5.

4.  In February 1992, while Mr. Heuser's criminal proceeding was pending on appeal,[4]
Kephart sought permission to enter and inspect Plaintiffs' property.  Permission was denied.  *See*
Doc. No. 360, Att. 1 at ¶ 12.

5.  Kephart sought advice from the County Attorney on how to obtain a warrant.  *See*
Doc. No. 503 at ¶ 36.   The County Attorney advised Kephart to discuss the matter with a
Magistrate.  *See id.*  Kephart went to Magistrate Brenda Hines.

6.  The State of New Mexico Electrical Code, adopted by the City of Farmington, set
forth the circumstances when an administrative search warrant may be obtained by an electrical

---

[4]With respect to this issue, Defendants assert that Kephart had no knowledge of the
pendency of the appeal, "notwithstanding documentation indicating that a copy of the notice was
mailed to his attention, at the time in question."  *See* Doc. No. 360, ¶ 5.  In fact, Defendants own
submissions indicate that Kephart did know about the appeal, at least as of March 23, 1992.  *See*
Doc. No. 360, Att. 1, Ex. 1.

inspector, the procedure for obtaining such a warrant, and the information which must be contained in such a warrant application.  *See* Doc. No. 359, Ex. 4.

7.  The proper procedures for obtaining an administrative search warrant do not include seeking the assistance of law enforcement officials.  *See id.*

8.  Magistrate Hines advised Kephart to discuss the matter with the Sheriff's Department. Kephart sought assistance from Deputy Sheriff Cheverie.  *See* Doc. No. 503 at ¶¶ 37-38.

9.  Cheverie presented an affidavit to obtain a criminal search warrant to Magistrate Hines. Based on what Kephart told him, Cheverie alleged facts asserting violations of the county building code.  *See* Doc. No. 360, Att. 1 at ¶ 16.

10.  Neither Kephart, Cheverie, Hrzich, nor McQuitty demonstrated to the Magistrate Hines their credentials to conduct an administrative inspection.  *See* Doc. No. 133, Att. 3.

11.   A valid administrative search warrant was not obtained by Kephart nor by any other inspector before Plaintiffs' property was searched.

12.  Deputy Cheverie, based on Kephart's statements to him, alleged that there were violations of "county ordinances regarding proper set back and or fire separations" on the property, that the Heusers failed to obtain "a building permit or building permits for building upon the property," and that there appeared to be "five or more structures that appear to be fire hazards to adjacent buildings and property lines."  *See* Doc. No. 133, Att. 3.

13.  Deputy Sheriff Cheverie stated in the affidavit that Mr. Heuser "has concealed on his property evidence of crimes" in violation of County Ordinance No. 9.  *See* Doc. No. 359, Ex. 3.

14.  Deputy Sheriff Cheverie alleged in the affidavit that Plaintiffs' refusal to allow Kephart right of entry on their property without a warrant in itself violated the building code.  *See*

Doc. No. 133, Att. 3.

15.   Deputy Sheriff Cheverie did not have any first-hand knowledge of any building code violations on Plaintiffs' property; he based the allegations in the affidavit solely on the representations made to him by Kephart.

16.   Deputy Sheriff Cheverie stated in the affidavit that Kephart had viewed the property several times and took pictures revealing "buildings which had not been there four years before." Deputy Sheriff Cheverie described these buildings as "several wooden buildings and a cinder block building or barn."  *See* Doc. No. 133, Att. 3.

17.   Kephart testified in his deposition that the only buildings he saw during his 1992 inspections were a hay barn, built in 1982 or 1983, and the grain shed.  *See* Doc. No. 361, Ex. 5 at 234.

18.   Magistrate Hines was not aware of the United States Supreme Court's holding, then over twenty years old, that it is not a crime for a person to refuse to consent to a warrantless building inspection.  *See Camara v. Municipal Court of City and County of San Francisco*, 387 U.S. 523 (1967); Doc. No. 503 at 33.

19.   The warrant Magistrate Hines issued ordered only that "Frank Kephart be allowed to gain access to property to write out specific code violations and to make a detailed inspection of all structures excluding the residence."  *See* Doc. 133, Att. 3 (emphasis added).

20.   Kephart has neither the credentials nor the authority to conduct electrical or plumbing inspections.

21.   No allegations of electrical or plumbing code violations were made in the affidavit that would demonstrate the necessity to conduct electrical or plumbing inspections of any building

14

on Plaintiffs' premises.  *See* Doc. No. 133, Att. 3.

22.   Despite the fact that no violations of electrical codes were alleged in the affidavit, Kephart asked Hrzich to investigate the electrical wiring system of "the premises" belonging to Plaintiffs.  *See* Doc. No. 232.  Hrzich is a licensed and ICBO certified electrical inspector. Hrzich asked Defendant McQuitty, who is a code compliance officer for the City of Farmington, to accompany him on the investigation.  *See* Doc. No. 232.

23.   On March 11, 1992, Deputy Sheriff Cheverie and four other San Juan County Deputy Sheriffs accompanied Kephart to Plaintiffs' premises, along with Hrzich, McQuitty, a state plumbing inspector, and an animal control officer.

24.   Deputy Sheriff Cheverie served the warrant on the Plaintiffs.  *See* Doc. No. 359 at ¶ 14; Doc. No. 360 at ¶ 14.

25.   Defendant Hrzich conducted an inspection of Plaintiffs' premises based in part on the alleged authority of the criminal search warrant.  *See* Doc. No. 232.

26.   Defendant Cheverie told San Juan County Deputy Sheriff Curtis to inspect all the vehicles that were on Plaintiffs' property, write down the license plate numbers of the vehicles, and give the information back to Cheverie.  *See* Doc. No. 359, Ex. 6.

27.   Although the search warrant expressly excluded Plaintiffs' residence from the scope of the search, Defendants Hrzich and McQuitty entered and inspected Plaintiffs' residence. *See* Doc. No. 233.

28.   Defendant Hrzich documented alleged electrical code violations regarding Plaintiffs' residence and ordered Plaintiffs to come into compliance with current electrical codes.  *See* Doc. No. 359, Ex. 7.

15

29.  Plaintiffs disputed the truth of most of the allegations and disputed the significance of others.  *See* Doc. No. 359, Ex. 1 & 2; Doc. No. 360 at ¶ 19.

30.  The City of Farmington has promulgated a regulation governing the circumstances under which electrical service may be terminated.  *See* Doc. No. 359, Ex. 8; Doc. No. 360 at ¶ 21.

31.  Plaintiffs' residential electrical service, as well as service to the grain shed, was terminated on June 10, 1992.  The electricity to the residence was severable from the electricity to the grain shed, each ran through a separate meter box, and the electricity could have been disconnected to the grain shed without disconnecting the service to the residence.  *See* Doc. No. 359, Ex. 1; Doc. No. 360 at ¶ 20.

32.  On April 2, 1993, Plaintiffs' electricity was restored.  However, it was terminated again, without any notice, on May 26, 1993.

33.  On May 27, 1993, several FUS employees got on top of the roof of the Heusers' home, without permission, and removed the wires running from the house to the electrical pole. These wires had been purchased by the Heusers.  *See* Doc. No. 359, Ex. 1 at ¶ 13.

34.  Plaintiffs' power was terminated on two separate occasions.  On neither occasion did Plaintiffs receive notice advising them of the availability of a procedure for protesting the proposed termination of service as unjustified, nor were they provided with a hearing to protest the allegations against them.  *See* Doc. No. 359, Ex. 1;  Doc. No. 360 at ¶¶ 20, 22, 23, 25.

### Remaining Factual Issues

As explained above, a motion for summary judgment should be denied only if the nonmoving party can show that there is a *genuine* dispute as to an issue of *material* fact. "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that

might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  In other words, neither the existence of nonmaterial factual issues nor the existence of material factual issues about which there is no genuine dispute will preclude a grant of summary judgment.

In their Supplemental Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion for Partial Summary Judgment, the San Juan County Defendants argue that Mr. Heuser operated a "business" out of the premises, *see* Doc. No. 503 at ¶ 1, that the grain shed was used to process feed, *see id.* at ¶¶ 2-3, and that the Heusers never obtained a building permit for the grain shed, *see id.* at ¶ 5.  They go on to argue, in detail, why the Heusers' failure to obtain a building permit or a Certificate of Occupancy allegedly violated the county building and electrical codes.  *See id.* at ¶¶ 5-20.

The issue in this case, of course, is not whether Mr. and Mrs. Heuser violated San Juan County's building and/or electrical code.  That is a purely local matter which should be left in the hands of local governing officials.  Moreover, the resolution of that issue will not affect the outcome of this suit, which is governed by the United States Constitution.  Therefore, the Court finds that whether the Heusers violated the local building and/or electrical code is not a material issue precluding summary judgment.

The Defendants also dispute Plaintiffs' contention that Kephart was not authorized to perform a building code inspection of their property.  Plaintiffs contend that the Construction Industries Division Rules and Regulations mandated that anyone performing county building

permit and inspection processes be ICBO certified by January 1, 1991, *see* Doc. No. 218, Ex. 1

(CID-90-1 § 700), and that Kephart was not ICBO certified at the time he asked Deputy Cheverie

to obtain a search warrant that would allow him to inspect Plaintiffs' property for building code

violations on March 11, 1992, or at the time of the inspection, *see* Doc. No. 131, Ex. 5; Doc. No.

360 at ¶ 6.  Defendants point out, however, that Kephart was certified by the Construction

Industries Division as a county building official in 1981 and that he remained certified until he

retired in 1995.  *See* Doc. No. 133, Att. 1; Doc. No. 503 at ¶ 27.  Moreover, Defendants have

submitted evidence that while New Mexico originally required all building inspectors to become

ICBO-certified by January 1, 1991, the state later amended this requirement to require all building

inspectors to become ICBO-certified by July 1, 1994.  *See* Doc. No. 360, Att. 1, Ex. 11.[5]

  As explained above, however, Plaintiffs seek summary judgment on their claims that the

warrant was obtained through judicial deception, that the search exceeded the scope of the

warrant, and that the termination of their electricity violated procedural due process.  For the

reasons explained below, which are not dependent on Kephart's authority to conduct building

inspections, the Court finds that Plaintiffs are entitled to summary judgment on each of these

claims.  In other words, resolution of this issue will not affect the Court's resolution of the claims

on which Plaintiffs seek summary judgment.  Therefore, the Court finds that this factual dispute is

not material to the outcome of Plaintiffs' summary judgment motion.

  Finally, Defendants assert in their Supplemental Memorandum that this "lawsuit involves

---

[5]Defendants also argue that Mr. Heuser knew that Kephart was a county building official during the events in question.  *See* Doc. No. 360 at ¶ 10.  However, what Mr. Heuser knew or did not know regarding Kephart's job title is not relevant to the issue of whether Kephart was authorized, as a matter of local law, to perform building inspections.

the belief of two men, Anthony Heuser and his friend Winfred Paul Adams, that the undeniable right of the County to enforce the San Juan County Building Code is defeated by their property rights."  Doc. No. 503 at 3.[6]  Defendants also go so far as to suggest that Mr. Heuser's association with Mr. Adams and Mr. Heuser's opinions regarding the scope of governmental authority present genuine issues of material fact precluding summary judgment.[7]  The Court finds that Mr. Heuser's associations and political opinions are not material to the matters addressed in the summary judgment motion.

## Analysis of the Claims

**Judicial Deception**.  Plaintiffs claim that the search warrant issued by Magistrate Hines was invalid under the Fourth Amendment because it was based on judicial deception.  Specifically, Plaintiffs argue that Deputy Sheriff Cheverie falsely claimed in his affidavit that Mr. Heuser's refusal to permit Kephart to enter and inspect the property was a crime.  Plaintiffs also contend that Cheverie's affidavit contained the false statement that Kephart had taken pictures of Plaintiffs' property reflecting "buildings which had not been there four years before" and for which no permit had been obtained when, in fact, the only building at issue was the grain shed.

---

[6]This action is approximately six years old.  At no time throughout the course of the proceedings has any pleading described the nature of the case in this manner.  In any event, it is settled law that a local building code, while undeniably important, cannot constitutionally be enforced in a manner that impinges on an individual's rights under the Fourth or the Fourteenth Amendment.

[7]*See, e.g.,* Doc. No. 503 at 2 ("These issues include Anthony Heuser's extreme view of Fourth Amendment property rights [and] Anthony Heuser's association with Winfred Paul Adams in attacking the local government and its judiciary rather than code compliance"); *id.* at 5 (Mr. Heuser adopted "a scathing tone toward the County"); *id.* at 5-6 ("Mr. Heuser is a citizen of San Juan County and a political activist who espouses extremist views in opposition to local, state, and federal government.  Adams has spoken disparagingly of the federal judiciary in the State of New Mexico.")

Finally, Plaintiffs claim that Cheverie stated in the affidavit that the information contained therein was revealed through his investigation when, in fact, Cheverie had not done any independent investigation of the property at all.

It is well settled that a "search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." *Camara v. Municipal Court*, 387 U.S. 541, 545 (1967). This principle applies to both administrative and criminal searches of private property. *See id.* A warrant that is obtained through deception is not a valid warrant. *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978).

When an affiant makes a deliberate or reckless false statement in an affidavit which is material to the issue of probable cause, the Fourth Amendment is violated. *See id.* However, the mere presence of misstatements in an affidavit does not, in itself, render a warrant invalid. Rather, a reviewing court must make a determination as to whether the affidavit would be sufficient to establish probable cause if the false statements were omitted. *See id.*; *Stewart v. Donges*, 915 F.2d 572, 581-83 & n.11 (10th Cir. 1990).

Whether this standard has been met in this case depends on whether the search warrant was criminal or administrative in nature. If the search warrant was criminal in nature, the affidavit must establish probable cause in the criminal sense, i.e., the affidavit must set forth facts that would lead a prudent person to believe there is a fair probability that contraband or evidence of a crime will be found in a particular place. *See Illinois v. Gates*, 462 U.S. 213, 238 (1983); *United States v. Wicks*, 995 F.2d 964, 972-73 (10th Cir.), *cert. denied*, 510 U.S. 982 (1993).

If the search warrant was administrative in nature, it must meet a relaxed standard, i.e., the facts alleged in the affidavit must establish that "the public need for effective enforcement of the . .

20

. regulations involved justifies the intrusion, weighed in relation to the reasonable goals of the code [being enforced]."  *In re Carlson v. United States District Court*, 580 F.2d 1365, 1378 (10th Cir. 1978).

This Court has already held that the search warrant obtained in this case was criminal and Defendants have failed in their efforts to persuade the Court that its prior rulings were either factually or legally incorrect.  The Court now finds again that the search warrant at issue here was criminal and bases its conclusion on the following factors.

First, the affidavit was sworn by Defendant Cheverie, a detective with the San Juan County Sheriff's Department.  The affidavit was not sworn by Kephart, or any other administrative official.[8]  Second, the affidavit was submitted to the magistrate pursuant to New Mexico Magistrate Court Criminal Rule 13 and alleged that Mr. Heuser had "concealed on his property evidence of crimes."   Third, the warrant itself was issued on Criminal Form 2.50. Fourth, the procedures employed for obtaining the warrant clearly did not meet the requirements for obtaining an administrative warrant under the state electrical code.  New Mexico has promulgated specific procedures to be employed when obtaining an administrative warrant. Pursuant to this procedure, when an owner or occupant of a building refuses to allow an electrical inspector to enter the building, *the inspector* is required to obtain a search warrant.  To do so, *the inspector* is required to file a complaint upon a magistrate court which, *inter alia*, states that the inspector is approved by the Bureau and is authorized by it to make the inspection.  *See* Doc. No. 359, Ex. 4.  In this case, Cheverie, a police officer, filed the affidavit and neither Cheverie nor

---

[8]The fact that Magistrate Hines advised Kephart to seek the assistance of the police, in direct contravention of the applicable provisions of the New Mexico State Electrical Code, *see infra*, is, at best, irrelevant.

Kephart demonstrated that they were authorized to make inspections.[9]  Finally, the search warrant was served by Deputy Sheriff Cheverie, in the presence of four other police officers, as well as Kephart, Hrzich, McQuitty, a plumbing official and an animal control officer.  There can be no doubt that this warrant was criminal in nature.  This Court's prior rulings to that effect have not been disturbed and are amply supported by the record.

Because the warrant was criminal, it was permissible under the Fourth Amendment if the affidavit established probable cause under *Illinois v. Gates*.  As explained above, in a judicial deception case, the Court must determine whether the affidavit establishes probable cause once any materially false statements are omitted.  *See Stewart*, 915 F.2d at 581-83 & n.11.

Defendants set forth three specific arguments in support of their position that, even assuming the warrant was criminal in nature, Plaintiffs' judicial deception claim must fail.  First, they argue that Magistrate Hines was not actually deceived by the false statements.  *See* Doc. No. 503 at 31.  Second, they argue that *Franks v. Delaware* requires Plaintiffs to make a preliminary showing that the false statements were made knowingly or with reckless disregard for the truth and that Plaintiffs have failed to carry this burden.  *See id.*[10]  Third, they argue that the statements

---

[9]Defendants argue that this does not matter because Magistrate Hines "knew" Kephart was a county building official.  As Plaintiffs correctly point out, however, there is no exception under the state regulations permitting the issuance of an administrative warrant when the magistrate knows the affiant's job title, notwithstanding the failure of the affiant to set forth his or her credentials in the complaint.  In any event, Kephart was not the affiant, so what Magistrate Hines knew or did not know regarding his job title is not relevant.

[10]In a footnote, Defendants request an evidentiary issue on this issue.  *See* Doc. No. 503 at 31.  Plaintiffs are correct, however, that a *Franks* hearing is not required in a § 1983 action for damages based on a judicial deception claim.  The Court finds that a *Franks* hearing on this matter would not aid the Court in its disposition of Plaintiffs' Summary Judgment motion and, therefore, declines to hold such a hearing.

made in the affidavit were not actually false because violations of the building code were, in fact, punishable as crimes.  *See id.* at 31-33.  The court will address each of these arguments in turn.

First, the Court is not persuaded that Magistrate Hines's statement in her affidavit, executed nine years after the events in question occurred, that she was not deceived by Cheverie bears on the issue of whether the statements in the affidavit were sufficient to establish probable cause.  Hines admits that she directed Kephart to seek assistance from the county police (despite the fact that there were specific procedures in place for seeking administrative warrants that did not include the involvement of law enforcement officials),[11] so it is reasonable to believe that she was at least sufficiently deceived to believe that there was a need to involve the police.  Moreover, Hines does not address in her affidavit Plaintiffs' assertion that Kephart lied about the number of buildings that he saw on the property.  In other words, Defendants have offered no evidence to rebut Plaintiffs' assertion, which *is* supported by the evidence, that Hines was deceived by Kephart's false statement to Cheverie that there were multiple buildings on the property that were in violation of the building code.

Second, Plaintiffs have satisfied their burden of establishing that the false statements contained in the affidavit were made knowingly or with reckless disregard for the truth.  Cheverie stated in the affidavit that *his* investigation revealed violations of the code.  Cheverie must have known, and Defendants concede that he did know, that he did not personally conduct any investigation.  Moreover, Plaintiffs have established that the affidavit contained the false statement that there were multiple "buildings" on the property that were in violation of the code and that

---

[11]That Hines was not aware of these procedures does not excuse Defendants' failure to comply with them.

Kephart knew this was not true.  Finally, as the Court has already found, the affidavit contained the materially false statement that Heuser's refusal to consent to a warrantless inspection was illegal.[12]

Finally, the Court is not persuaded by Defendants' argument that the statements in the affidavit were technically not false.  Cheverie stated in the affidavit that Heuser's refusal to consent to a warrantless inspection "was itself a violation of the code."  Defendants argue that this is not a false statement because refusing entry was actually a violation of the Building Code and because "neither Kephart, Cheverie, nor Magistrate Hines were aware of the holding in *Camara*."  Defendant has not submitted a copy of the Building Code that makes refusal to consent to a warrantless search a violation of the code, so the Court has no way of verifying Defendant's contention.  Moreover, Defendant has not provided any information on the current status of that provision.[13]  In any event, Kephart and Cheverie should have known that Heuser could not be prosecuted for refusing consent under *Camara*; this renders their statement highly misleading at best.

Moreover, Defendants have submitted no evidence to rebut Plaintiffs' supported contention that Kephart lied about the number of buildings on the property that allegedly violated

---

[12]Defendant argues, apparently in response to this finding by the Court, that neither Magistrate Hines nor the prosecuting attorney who reviewed the affidavit was aware, in 1992, of the Supreme Court's 1967 holding in *Camara*.  Defendant also characterizes *Camara* as an "obscure legal point of administrative search and seizure law."  Doc. No. 503 at 31-32.  It is difficult to understand how these arguments could possibly be made in support of Defendants' position.  *Camara* is hardly an obscure point; it is the landmark case establishing that the Fourth Amendment applies to administrative searches.  Any magistrate entrusted with the responsibility of issuing administrative search warrants surely ought to be aware of it.

[13]The constitutional validity of such a provision, in light of *Camara*, is dubious.

the building code.  Finally, while Defendant does state that Magistrate Hines knew that Cheverie did not personally conduct any investigation of the Heusers' property, Defendant offers nothing to suggest that Cheverie's representation to the Magistrate that the allegations in the affidavit were based on his own investigation was actually true.

This Court has already ruled that Cheverie's affidavit contained materially false statements and that when these false statements are omitted, the affidavit fails to establish probable cause. *See* Doc. No. 306 at 4.  Defendants do not challenge this Court's prior ruling that, if the warrant was criminal in nature, then the affidavit, when the false statements are omitted, does not establish probable cause in the criminal sense.  They simply argue that the warrant was administrative in nature, *see* Doc. No. 503 at 21-30, that the affidavit satisfied the relaxed standard for probable cause that is applied in administrative search cases, *see id.*, and that this Court's prior holdings "surely cannot stand in light of the evidence."  *Id.* at 33.

For the reasons set forth above, the Court concludes that the warrant was criminal in nature and that the affidavit, when any materially false statements are omitted, does not set forth facts that would lead a prudent person to believe there was a fair probability that contraband or evidence of a crime would be found on the Heusers' property.  *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Defendants have not come forward with any genuine issues of material fact to rebut the evidence set forth in support of Plaintiffs' claim.  Accordingly, the Court concludes that Plaintiffs are entitled to summary judgment on their claim that the warrant was obtained by judicial deception.

**Exceeding the scope of the warrant.**  It is well established that no warrant may issue unless "it 'particularly describ[es] the place to be searched and the persons or things to be

seized.'" *Horton v. California*, 496 U.S. 128, 139 (1990) (quoting *Maryland v. Garrison*, 480

U.S. 79, 85 (1987)).  In accordance with this firmly-established doctrine of constitutional

jurisprudence, a search conducted pursuant to a warrant must be "confined in scope to

particularly described evidence relating to a specific crime for which there is demonstrated

probable cause."  *Voss v. Bergsggard*, 774 F.2d 402, 404 (10th Cir. 1985).  A search that exceeds

the scope of the warrant that authorizes it violates the Fourth Amendment.  *See United States v.*

*Carey*, 172 F.3d 1194, 1268 (10th Cir. 1999) (reversing district court's denial of motion to

suppress on ground that search and seizure exceeded scope of warrant).

      As explained above, it is undisputed that Cheverie's affidavit alleged facts asserting that

there were violations of "county ordinances regarding proper set back or fire separations," on the

Heusers' property, that the Heusers' failure to obtain a building permit for the grain shed was a

violation of the building code, and that Mr. Heuser's refusal to allow Kephart to enter and inspect

violated the building code.  The affidavit did not allege any facts suggesting a need to search for

violations of the electrical code.[14]  Moreover, it is undisputed that the warrant's stated purpose

was to allow *Kephart* onto the property to inspect for violations of the building code.  Finally, it is

undisputed that the warrant specifically excluded the residence from the scope of the search.

      Despite the fact that the warrant authorized *Kephart* to perform the inspection, Cheverie,

a Deputy Sheriff, executed the warrant.  He did so in the presence of four other law enforcement

officers.  Moreover, Kephart did not inspect the property for electrical code violations.  Rather,

---

[14]The affidavit did state that Kephart *intended to* search for violations of the electrical
code, notwithstanding the fact that he had no authority to do so, and notwithstanding the fact that
neither Kephart nor Cheverie alleged any facts to suggest that there might even be electrical code
violations on the Heusers' property.

he brought a city electrial inspector and a city code compliance officer to do so.  Kephart also

brought a plumbing inspector, although no facts were alleged in the affidavit to suggest that there

were plumbing problems on the property.  For reasons apparently having nothing to do with the

allegations presented in the affidavit or the purpose for which the warrant was purportedly issued,

Kephart also brought an animal control officer.  The warrant authorized one person, Kephart, to

enter onto the property and it authorized him to inspect for violations of the building code, as well

as the electrical and plumbing installations on the property.  It did not authorize the entry onto the

property of five police officers, a city electrical inspector, a city code compliance officer, a

plumbing official, and an animal control officer.

In addition, the warrant authorized a search of "all building [sic] and structures located on

said property, *other than the residence*."  Plaintiffs have offered evidence in support of their

contention that the garage was attached to the residence and that the residence could be entered

through the garage.  *See* Doc. No. 359, Ex. 1; Doc. No. 361, Ex. 3.  Plaintiffs have also offered

evidence in support of their contention that Defendants knew the residence was not to be

searched.  *See* Doc. No. 361, Ex. 1 at 64, 66.  Nonetheless, Hrzich and McQuitty entered the

residential garage in order to search for electrical violations.

Government officials executing a warrant are not free to flagrantly disregard the terms of

the warrant.  *See United States v. Foster*, 100 F.3d 846, 849 (10th Cir. 1996).  Defendants have

not offered any evidence to create a genuine dispute of material fact with respect to Plaintiffs'

claim that Defendants did disregard the terms of the warrant in this case.  There is no genuine

dispute that the warrant authorized only Kephart to enter onto the property or that the warrant

specifically excluded the residence from the scope of the search.  There is also no genuine dispute

that Kephart brought along five police officers and several other administrative officials to perform the search, or that the residential garage was searched.

Defendants do argue that they cannot be liable for the search of the residential garage because it was city inspectors, not county officials, who actually entered the residential garage. The Court is not persuaded by this argument.  It is well established that government officials may be liable for affirmatively facilitating or encouraging other government officials to engage in unconstitutional conduct.  *See Robinson v. Maraffi*, 895 F.2d 649, 655 (10th Cir. 1990).  Plaintiffs have demonstrated that the city inspectors did not even fully understand the purpose of their presence on the Heusers' property until Kephart asked them to perform an electrical inspection, that Kephart did not permit them to review the warrant prior to performing the inspection, and that they would not have performed the inspection if they had understood the circumstances under which Kephart brought them there.  *See* Doc. No. 507, Ex. 4 at 16-19, 43-46, 62; Ex. 5 at 36-37, 39-40, 52-53, 125-127.  Defendants have not come forward with any evidence to create a genuine issue of material fact with respect to these contentions.  Accordingly, the Court concludes that Defendants may be held responsible for the illegal search and that Plaintiffs are entitled to summary judgment on this claim.[15]

**Due Process.**  The Due Process Clause of the Fourteenth Amendment prohibits the state from depriving any person of life, liberty, or property without due process of law.  It is well established that customers of utility services have a property interest in their service.  *See*

---

[15]Because the Court is granting summary judgment on Plaintiffs' claim that the search exceeded the scope authorized by the warrant, the Court declines to address Plaintiffs' argument that Hrzich and McQuitty did not have jurisdiction to inspect the Heusers' property or their argument that the 1992 electrical code could not legally be retroactively applied to them.

*Memphis Light, Gas and Water Div. v. Craft*, 436 U.S. 1, 18 (1978).  Where a state or local law

restricts the ability of a municipal utility provider to terminate service, customers of the provider

have a protected property interest in the continuation of service.  *See id.* at 11-12 ("[s]tate law

does not permit a public utility to terminate service 'at will.' . . . Because petitioners may

terminate service only 'for cause,' respondents assert a 'legitimate claim of entitlement' within the

protection of the Due Process Clause.")

    In 1992, FUS had a set of Rules and Regulations, setting forth the specific conditions

under which electricity could be terminated.  *See* Doc. No. 359, Ex. 8.[16]  By setting forth specific

circumstances under which electricity service could be terminated, FUS established a system

providing for the termination of service "for cause" only.[17]  Therefore, the Heusers had a property

interest, protected under the Due Process Clause, in the continuation of their electrical service.

    When there is a protected property interest, the utility must provide notice that comports

with due process guarantees prior to terminating service.  *See Craft*, 436 U.S. at 13.  Such a

notice must be  "reasonably calculated, under all the circumstances, to apprise interested parties of

the pendency of the action and afford them an opportunity to present their objections."  *Id.* at 13

(quoting *Mullane v. Central Hanover Trust Co.*, 339 U.S. 306, 314 (1950)).  It must "apprise the

affected individual of and permit adequate preparation for, an impending 'hearing.'"  *Id.* at 14

---

[16]"Service may be refused or discontinued by the Electric System," *inter alia*, "in the event
of a condition determined by the Electric System to be hazardous," . . . "for violation of and/or
noncompliance with these rules and applicable codes," . . . or "for nonpayment of bill."  Rules &
Regulations Covering Electric Service, Rule and Regulation No. 7(A).

[17]*Accord Frates v. City of Great Falls*, 568 F.Supp. 1330, 1337 (D. Mont. 1983) (a
"specification of reasons, for which services may be terminated, amounts, in essence, to a
recognition that termination may be for cause only, and clearly refutes the conclusions that the
utility or governing body has a right to terminate services at will.")

(quoting *Wolff v. McDonnell*, 418 U.S. 539, 564 (1964)).  Notice "does not comport with constitutional requirements when it does not advise the customer of the availability of a procedure for protesting a proposed termination of utility service as unjustified."  *Id.* at 14-15.  "The opportunity for informal consultation with designated personnel empowered to correct a mistaken determination constitutes a 'due process hearing' in appropriate circumstances."  *Id.* at 16.

It is undisputed that the Heusers timely paid their electric bills for approximately twenty years prior to the events in question.  It is also undisputed that the notice FUS gave the Heusers prior to the June 1992 termination of municipal electrical service did not give them any information as to how to challenge FUS's determination that there were electrical violations on their property, did not inform them of the date and time of a hearing, and did not give them the name of an FUS employee who could hear and address their objections.  Therefore, FUS failed in its constitutional obligation to provide the Heusers with "notice reasonably calculated" to afford them an opportunity to present their objections prior to terminating their electrical service in June of 1992.  It is also undisputed that the Heusers did not receive any notice at all prior to the May 1993 termination of service.  Therefore, the May 1993 termination did not comport with due process guarantees either.  Accordingly, the Court finds that there is no genuine dispute as to any material fact with respect to this claim and that Plaintiffs are entitled to judgment as a matter of law.  The Court will therefore grant summary judgment on Plaintiffs' claim that both instances of electricity termination violated their procedural due process rights.

**B. Defendants' Notice of Objection and
Motion for Order to Show Cause**

Defendants sought to depose Winfred Paul Adams.  A deposition was scheduled for

sometime in April 2001 and when Mr. Adams failed to attend, Defendants issued a subpoena ordering Mr. Adams to appear for a deposition on May 3, 2001.  In response, Mr. Adams filed a document entitled "Verified Notice to the President of the United States and to the United States District Court" ("Verified Notice").  In this Notice, Mr. Adams stated that he would not appear at his deposition and expressed his general disrespect for, and disagreement with, the federal judiciary.  Defendants filed a Motion to Enforce the Subpoena, which Magistrate Judge Smith denied.  Defendants have filed objections to Magistrate Judge Smith's order and seek an Order to Show Cause why Mr. Adams should not be compelled to appear.

The Federal Rules of Civil Procedure provide that parties are entitled to obtain discovery regarding "any matter, not privileged, that is relevant to the claim or defense of any party, including the existence, description, nature, custody, condition, and location of any books, documents or other tangible things and the identity and location of persons having knowledge of any discoverable matter."  Fed. R. Civ. P. 26(b)(1).  Moreover, a District Court may order discovery of any matter relevant to the subject matter involved in the action "for good cause."  *Id.* Finally, a District Court may limit discovery if "the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(2)(iii).  Of course, the Rules must always be "construed and administered to secure the just, speedy, and inexpensive determination of every action."  Fed. R. Civ. P. 1.

Magistrate Judge Smith denied Defendants' Motion upon finding that Defendants failed to demonstrate that Mr. Adams's deposition testimony would be relevant to any claim or defense of any party, *see* Order Denying Mot. for Order to Enforce Subpoena at 1, and upon finding that any benefit to be obtained by enforcing the subpoena would be outweighed by the risk of harm to Mr.

31

Adams, *see id.*[18]

The Court finds that, for the following reasons, Magistrate Judge Smith's findings and conclusions were neither clearly erroneous nor contrary to law.  *See* Fed. R. Civ. P. 72(e); *Epling v. UCB Films, Inc.*, 2001 WL 584355, *1 (D. Kan. Apr. 2, 2001).  First of all, Mr. Adams is not expected to be called as a witness for any party.  Second, Defendants have simply not produced anything to suggest that Mr. Adams has information that is relevant to the issues presented in this action.  There is nothing to indicate that Mr. Adams has any information pertaining to the government's efforts in obtaining the warrant, to the execution of the warrant, or to the termination of the Heusers' electricity.  It does appear that Mr. Adams was present at the Heusers' home when the electricity was disconnected on June 10, 1992.  However, Plaintiffs do not challenge the events that occurred on that date, other than the fact of termination, which is not contested.

Defendants argue that Mr. Adams's deposition is necessary because the matters sought to be discovered through a deposition "are relevant to the factual events surrounding the issuance of the search warrant."  Notice of Objection at 1.  However, they do not give any indication as to why this is so.  Defendants also argue that the deposition testimony is relevant to their defense that Adams and Heuser "sought to oppose the efforts of the County and City to extend code enforcement to the Plaintiffs' property."  *Id.* at 2.  However, whether or not Adams and Heuser politically opposed the city's and county's efforts to extend their code enforcement activities beyond the city limits is not relevant to the issue of whether the warrant, search, and electricity

---

[18]Without going into great detail, Magistrate Judge Smith intimated that the latter finding was based at least partly on Mr. Adams's status as a combat veteran.  *See* Order Denying Mot. for Order to Enforce Subpoena at 2 n.1.

termination were constitutional.[19]

Finally, Defendants state that Adams's deposition testimony is necessary because "Adams, as a vocal opponent of many established institutions of Federal, State, and local government, likely influenced Heuser through his 'constitutionalist' ideology that generally involved resistance to local government." *Id.* at 2. Defendants also argued in their Motion to Enforce the Subpoena that it is necessary for them to depose Mr. Adams because Mr. Adams "has information on [Heuser's] political views long sought by these Defendants." Mot. to Enforce Subpoena at 2.

Throughout the many pleadings that have been filed in this action, there are numerous references to Mr. Heuser and Mr. Adams being "constitutionalists," and to Mr. Heuser and Mr. Adams being derogatorily referred to as "constitutionalists" by various county and city officials. Moreover, as explained above, Defendants have repeatedly asserted their contention that Mr. Heuser has "extremist views" regarding his Fourth Amendment Rights and that he is "anti-government." Finally, Defendants make much out of the Heusers posting of a sign in their yard proclaiming their property to be a "Ruby Ridge/Waco Generating Station," in an apparent effort to "identify with the victims of those tragedies." Now Defendant argues that Mr. Adams's deposition testimony is necessary because it will uncover information regarding Mr. Adams's and Mr. Heuser's political views and associations.

It ought to go without saying that the First Amendment protects a citizen's right to vocally oppose any institution of any level of government and to associate with people who also oppose the institutions of government. Mr. Heuser's "extremist" view that the Fourth

---

[19]Defendants restate some of these proffered reasons in their Reply, but do not set forth, with any greater specificity, why they believe that Mr. Adams's testimony would be relevant to a claim or defense of any party.

Amendment must prevail over local building code enforcement does not render the warrant, the search, or the termination of electricity, constitutional.  The discovery process is not to be used as a tool for counsel to inquire into Mr. Adams's (or Mr. Heuser's) protected political beliefs.[20]

The Court also takes note of the fact that discovery has been proceeding in this matter for several years and that both parties have submitted substantial evidence in support of their summary judgment pleadings.  Furthermore, this Court has no knowledge of whether Mr. Adams's status as a retired combat veteran would place a burden on his ability to attend a deposition; however, Magistrate Judge Smith appears to have made a determination that it would and Defendants have not challenged that determination.  Therefore, the Magistrate Judge would have been within his discretion to limit discovery by denying Defendants' motion under Fed. R. Civ. P. 26(b)(iii) as well.

In sum, the Court finds that Magistrate Judge Smith's determination that Mr. Adams's deposition was not relevant to a claim or defense of any party was not "clearly erroneous" or "contrary to law," that there was no "good cause" for ordering the deposition, and that it was appropriate for Magistrate Judge Smith to limit discovery.  For all of these reasons, the Magistrate Judge's Order will be affirmed and the Motion for an Order to Show Cause will be denied.

---

[20]In any event, Mr. Heuser's political beliefs do not appear to be as staunchly anti-government as Defendants contend.  Mr. Heuser stated at his deposition that he did not oppose the authority of San Juan County to require building permits generally.  *See* Doc. No. 503, Deposition of Anthony Heuser at 91.  He also testified in his deposition that he believes firmly in the United States Constitution, "especially in the first ten amendments."  *Id.* at 98-99.  Finally, he has stated under oath that he believes that "state and local government have the right to enforce building code ordinances" but he also believes that "our system of government allows a citizen who believes the code is being misapplied to act on his belief by not complying with what he believes to be an improper order and to go to court."  *See* Doc. No. 507, Ex. 1 at ¶ 6.

34

## C. Defendants' Motion to Disqualify

Defendants' motion to disqualify is entirely without merit.  Defendants based their motion on the "Verified Notice" filed by Winfred Paul Adams.  In this notice, Mr. Adams states that he is a retired Major in the United States Air Force.  *See* Verified Notice at 1.  He lists each of the members of the United States District Court for the District of New Mexico and expresses his disagreement with some of the judges' actions and decisions.  *See id.* at 2-3.  He expresses his hostility for what he views as the unfair treatment of *pro se* litigants by members of the federal judiciary.  *See id.* at 5-7, 8-9.  He then goes on to decry the alleged fact that "twenty-one thousand (21,000) citizens of San Juan County alone out of a population of 110,000 (80,000 teen age juveniles and adults) have outstanding bench warrants for their arrest; not for being in contempt of the court but in open contempt of the tyrannical judicial system imposed upon them without any other means to express themselves without violence." [sic]  *Id.* at 7.  He continues by expressing outrage at the alleged fact that "two out of 3 persons residing in the county suffer respiratory illnesses, arthritis, diabetes, multiple sclerosis, kidney, liver, and cancer ailments probably due to the 100 tons of daily sulfur dioxide power plant emissions."  *Id.*

The Court can find nothing in Mr. Adams's discourse that would cause a reasonable person to doubt the Court's impartiality.  Defendants contend that the Court cannot possibly rule on their appeal of Magistrate Judge Smith's denial of their Motion to Enforce the Subpoena because "[i]f she enforces the subpoena, she is guilty of even more 'insurgent activity' in the eyes of the Mr. Adams [sic] and becomes a potentially bigger target for retaliation and physical harm.  On the other hand, if she quashes the subpoena, it creates the appearance that she acted out of fear and raises serious doubt about her objectivity."  Mot. to Disqualify at 6.

This contention is baseless.  First, Mr. Adams did not threaten the Court with retaliation or physical harm.  Mr. Adams mentions force only in the following sentence: "I am fully willing to bring to bear whatever force that can be brought in defense of [the refusal to honor the subpoena] including giving up my life, if such becomes necessary, just as I was willing to do so single-handedly while suppressing a Philippine Air Force mutiny in 1963."  In this statement, Mr. Adams appears to be stating that he is willing to defend his position, *notwithstanding any force that is brought upon him*.  The Court does not interpret Mr. Adams's statement as a threat to her safety.  In addition, there is simply nothing in the record to suggest that any decision that the Court arrives at with respect to Defendants' appeal of the Magistrate Judge's Order denying their Motion to Enforce the Subpoena would create the appearance that the Court acted out of "fear" or would cast doubt upon the Court's objectivity.

For these reasons, the Court agrees with Plaintiffs that Defendants' Motion is an impermissible attempt at forum shopping and that Defendants, "in their desperate effort to forum shop for a new judge, have taken Adams' uncomplimentary statements and have tried to combine them with his resistance to being deposed to concoct a claim that 'threats of violence' were made against this Court."  Mem. in Opposition to Mot. to Disqualify at 7.  Accordingly, the Motion to Disqualify will be denied.

Finally, Plaintiffs seek an Order admonishing the Defendants for filing what is, in effect, a surreply without seeking leave of court.  In its April 30, 2001 Order, the Court acknowledged that because of the unusual procedural progression of the case, additional briefing on Plaintiffs' summary judgment was warranted.  Accordingly, the Court granted Defendants an opportunity to file a supplemental brief and Plaintiffs an opportunity to respond.  Defendants then filed an

36

additional brief, notwithstanding the fact that the Order did not allow for any additional briefs. Nonetheless, the Court declines to admonish Defendants for their filing.  All of the parties to this action have been given great latitude in presenting all of their evidence and arguments.  The Court finds that admonition would not be appropriate in this instance.

**CONCLUSION**

**IT IS THEREFORE ORDERED that** Plaintiffs' Motion for Partial Summary Judgment **[Doc. No. 358]** is hereby **GRANTED**; the Magistrate Judge's Order Denying the Motion to Enforce Subpoena is hereby **AFFIRMED**; the San Juan County Defendants' Motion for Order to Show Cause **[Doc. No. 516]** is hereby **DENIED**; the San Juan County Defendants' Motion to Disqualify the Honorable Martha Vázquez **[Doc. No. 514]** is hereby **DENIED**; and the Plaintiffs' Motion to Admonish **[Doc. No. 525]** is hereby **DENIED**.


_____

MARTHA VÁZQUEZ
U. S. DISTRICT COURT JUDGE


<u>Attorney for Plaintiff:</u>
        Richard Rosenstock

<u>Attorneys for Defendants:</u>
        Mark J. Riley
        Richard J. Shane
        Courtenay L. Keller